**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **[1] BRIAN HILL,**<br>**[2] JULIE SANDERS,**<br>**[3] TIMOTHY L. BROWN,**<br>**[4] SAMUEL ISAAC BETHEA,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**[1] UNITED STATES DEPARTMENT OF ENERGY;**<br>**and**<br>**[2] CHRIS WRIGHT, in his official capacity as Secretary of Energy,**<br><br>**Defendants.** | ) | **Case No. 4:26-cv-00534-SH** |

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

Plaintiffs Brian Hill, Julie Sanders, Timothy L. Brown, and Samuel Isaac Bethea, by and through their counsel of record, Barrow & Grimm, for their causes of action against Defendants United States Department of Energy ("DOE") and Chris Wright, in his official capacity as Secretary of Energy ("Secretary"), show the Court the following:

1. This action challenges the DOE's use of a categorical exclusion issued for the first new primary-aluminum smelter to be built in the United States since 1980 before a site had even been selected, and DOE's award of monies toward the smelter project without conducting any site-specific review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. NEPA requires review of reasonably foreseeable effects at the earliest practicable point—before an irretrievable commitment of resources. *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 717–18 (10th Cir. 2009). Here, DOE authorized and funded Phase 1 of the smelter project when the project site was "TBD." The parties later selected Inola and

materially changed the project, and DOE made federal funds available for engineering, procurement planning, site characterization, and related Phase 1 development work.

2. DOE's use of the unlawful categorical exclusion threatens to produce a manufactured *fait accompli*. See *Maryland Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir. 1986) (holding that construction of project segments before completion of the EIS would inevitably influence the later federal decision and impermissibly present the agency with a "fait accompli"). DOE cannot fund one step after another, allow the project to become harder to change, and then rely on that same progress to resist review or relief. The Tenth Circuit has concluded that an agency violates NEPA when it predetermines an outcome where it "*irreversibly and irretrievably* committed itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed environmental analysis." *Forest Guardians v. U.S. Fish & Wildlife Service*, 611 F.3d 692, 714–15 (10th Cir. 2010)(emphasis in original). Here, DOE has done just that.

3. The State of Oklahoma has warned of the same problem in its separate action against the proposed smelter's developers. Seeking preliminary relief, the State warned that "[e]ach day of construction will also change the litigation itself" because the developers would later offer "their accumulating sunk costs as an equity against relief." It urged preservation of the status quo "while it still exists."[1]

4. The pending White House ballroom case, which also alleges NEPA violations, offers a current example. In an August 13, 2026 stay application, the government represented that the project was "65% complete in its entirety," that major design changes were no longer feasible,

[1] Plaintiff's Motion for Preliminary Injunction and Brief in Support at 22, *State of Oklahoma ex rel. Drummond v. Century Aluminum Co.*, No. 4:26-cv-00450-SEH-SH, Doc. 19 (N.D. Okla. Aug. 11, 2026).

and that the work was "beyond the point of judicial intervention." As part of its request to let construction continue, the government did not describe the project as simply a ballroom. It argued that the project was an "integrated military complex, including a totally secure ballroom space," was "vitally required by national security," and that "[t]he entire ballroom structure is designed to shield the military installation beneath it." On August 20, 2026, The Wall Street Journal described the recurring sequence more broadly: the Administration acts first and then "argues that it is too late for courts . . . to unwind what has already been done." In the ballroom case, that defense is now cast in concrete. The government points to hardened concrete, missile-resistant columns, and blast-proof glass already installed and says construction is "practically impossible" to stop. That is the danger here. The Inola project has not yet reached the point at which Defendants can plausibly say there is nothing left for a court to preserve. Effective relief remains possible now, before federal support and construction make the selected outcome physically, financially, and politically harder to undo.[2]

5. Plaintiffs expect DOE to make a similar argument here: a domestic aluminum smelter is important to national defense and supply-chain security. DOE has already emphasized those interests. Here, DOE authorized a narrow first phase while the site remained undetermined.

---

[2] *See* Application for Stay Pending Appeal at 1–8, 23–24, *Trump v. National Trust for Historic Preservation in the United States*, No. 26A203 (U.S. filed Aug. 13, 2026), https://www.supremecourt.gov/DocketPDF/26/26A203/419029/20260813211858520_August%20Ballroom%20Application%20-%20FINAL.pdf; *National Trust for Historic Preservation in the United States v. National Park Service*, Nos. 26-5123 & 26-5134 (D.C. Cir. Aug. 7, 2026), https://media.cadc.uscourts.gov/opinions/docs/2026/08/26-5123-2187096.pdf; Second Amended Complaint ¶¶ 146, 156-63, *National Trust for Historic Preservation in the United States v. National Park Service*, No. 1:25-cv-04316-RJL (D.D.C. Mar. 2, 2026), https://clearinghouse.net/doc/169110/; *see also* James Romoser & Will Hobson, *Build First, Ask Questions Later: Trump's Ballroom Puts Supreme Court in a Bind*, Wall St. J. (Aug. 20, 2026), https://www.wsj.com/politics/policy/build-first-ask-questions-later-trumps-ballroom-puts-supreme-court-in-a-bind-2c7ebe63.

The project was then fixed at Inola and changed in ownership, control, capacity, technology, and power arrangements. DOE continued administering the award without disclosing a site-specific NEPA determination while engineering, permitting, procurement planning, financing, and construction preparations made the selected outcome harder to reconsider. DOE's public NEPA record is still stuck at a site-undetermined Phase 1. The project is not.

6. Century Aluminum Company's Chief Executive Officer, Jesse Gary, described that momentum during the company's August 6, 2026 earnings call. He said the DOE grant "is secured," explained that the potential $500 million would be released as milestones were satisfied and eligible investments were made, and added: "Everything remains in place. . . . All looks good." He also reported progress on engineering, energy negotiations, and financing and said: "We continue to expect FID and groundbreaking by the end of this year." When asked about local opposition, Gary said the smelter would "pose no harm to anyone" and that Century was working with residents to "make sure that they get comfortable." Those statements show how quickly the project is moving and why federal support should not make the decision practically irreversible before DOE completes lawful review.[3]

7. DOE can still change course to bring this project into compliance with NEPA. If the site, scale, design, technology, power arrangement, mitigation, and no-action alternative remain open, an order against federal support for irreversible work will preserve those choices. If DOE has already foreclosed them through its award decisions, that supports the claim of premature commitment and cannot become a completion-based defense.

---

[3] Century Aluminum Co., *Q2 2026 Earnings Call*, 19:49, 26:07–27:15, 32:39–33:56 (Aug. 6, 2026), https://www.marketbeat.com/earnings/reports/2026-8-6-century-aluminum-stock/.

## PARTIES

8. Plaintiff Brian Hill ("Hill") resides at 32340 S. 4180 Rd., Inola, Rogers County, Oklahoma 74036. The residence, property, or regularly used location is approximately 370 feet, or 0.07 miles, from the proposed project boundary.

9. Hill resides on the property and regularly uses the property and surrounding area for both personal and commercial purposes, including personal recreation and enjoyment, the licensed rehabilitation of white-tailed deer, hay production, and planned cattle ranching. Hill and his wife use and enjoy the property and surrounding area daily and have concrete plans to continue doing so.

10. Hill personally experiences and values the area's present air quality, quiet, darkness at night, open views, wildlife, agricultural character, and current traffic conditions. Construction and operation of a primary-aluminum smelter within approximately 370 feet, or 0.07 miles, would expose those interests to increased noise, lighting, truck traffic, exhaust, dust, industrial emissions, accident risks, and potential effects on water resources.

11. Hill's residence, property, or regularly used location, water source, access roads, and ordinary activities are located within the area where site preparation, construction, operation, transportation, utilities, and associated infrastructure may cause environmental effects.

12. Plaintiff Julie Sanders ("Sanders") resides at 13452 E. 600 Rd., Inola, Rogers County, Oklahoma 74036. The residence, property, or regularly used location is approximately 1.6 miles from the proposed project boundary.

13. Sanders regularly uses the property and surrounding area for both personal and commercial purposes, including personal recreation and enjoyment, farming, cattle ranching, hay

production for livestock grazing, and hunting. Sanders does so daily and has concrete plans to continue doing so.

14. Sanders personally experiences and values the area's present air quality, quiet, darkness at night, open views, wildlife, agricultural character, and current traffic conditions. Construction and operation of a primary-aluminum smelter within approximately 1.6 miles would expose those interests to increased noise, lighting, truck traffic, exhaust, dust, industrial emissions, accident risks, and potential effects on water resources.

15. Sanders's residence, property, or regularly used location, water source, access roads, and ordinary activities are located within the area where site preparation, construction, operation, transportation, utilities, and associated infrastructure may cause environmental effects.

16. Plaintiff Timothy L. Brown ("Brown") resides at 16505 E. 640 Rd., Inola, Rogers County, Oklahoma 74036. The residence, property, or regularly used location is approximately 1.8 miles from the proposed project boundary.

17. Brown regularly uses the property and surrounding area for both personal and commercial purposes, including personal recreation and enjoyment, hay production, farming, and ranching. Brown does so daily and has concrete plans to continue doing so.

18. Brown personally experiences and values the area's present air quality, quiet, darkness at night, open views, wildlife, agricultural character, and current traffic conditions. Construction and operation of a primary-aluminum smelter within approximately 1.8 miles would expose those interests to increased noise, lighting, truck traffic, exhaust, dust, industrial emissions, accident risks, and potential effects on water resources.

19. The threatened injuries are geographically particularized. Brown's residence, property, or regularly used location, water source, access roads, and ordinary activities are located

within the area where site preparation, construction, operation, transportation, utilities, and associated infrastructure may cause environmental effects.

20. Plaintiff Samuel Isaac Bethea ("Bethea") owns property at 14800 E. 603 Rd., Inola, Rogers County, Oklahoma 74036. The property includes a cabin with electricity and water service and is approximately 1,995 feet, or 0.38 miles, from the proposed project boundary.

21. Bethea frequently stays overnight at the cabin and regularly uses the property and surrounding area for personal recreation and enjoyment and for hay production. He has concrete plans to continue those uses and to build a larger barndominium or cabin within the next few years so that he and his family can stay there more often and enjoy the property.

22. Bethea personally experiences and values the area's present air quality, quiet, darkness at night, open views, wildlife, agricultural character, and current traffic conditions. Construction and operation of a primary-aluminum smelter within approximately 1,995 feet, or 0.38 miles, would expose those interests to increased noise, lighting, truck traffic, exhaust, dust, industrial emissions, accident risks, and potential effects on water resources.

23. Bethea's property and cabin, water source, access roads, and ordinary activities are located within the area where site preparation, construction, operation, transportation, utilities, and associated infrastructure may cause environmental effects. The proximity of Plaintiffs' properties to the proposed project boundary is depicted in Exhibit 1.

24. Defendant United States Department of Energy is a federal agency within the meaning of the Administrative Procedure Act. DOE, acting through the Office of Clean Energy Demonstrations and any successor or related program office, selected and negotiated Project

Horizon, entered into and administered Award No. DE-CD0000111, and has obligated federal funds under that award.[4]

25. Defendant Chris Wright is the Secretary of Energy and is sued solely in his official capacity pursuant to 5 U.S.C. § 702. The Secretary is responsible for the lawful administration of DOE and its financial-assistance programs. The officeholder may be substituted automatically under Federal Rule of Civil Procedure 25(d).

**JURISDICTION, WAIVER OF SOVEREIGN IMMUNITY, AND VENUE**

26. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under NEPA, 42 U.S.C. § 4321 et seq., and the APA, 5 U.S.C. §§ 701–706.

27. The United States has waived sovereign immunity for this action seeking nonmonetary relief under 5 U.S.C. § 702.

28. The Court may review final agency action for which there is no other adequate remedy under 5 U.S.C. § 704, set aside unlawful agency action under § 706(2), and postpone the effective date of agency action or preserve the status quo under § 705.

29. The Court may issue declaratory relief under 28 U.S.C. §§ 2201–2202 and preliminary and permanent injunctive relief under Federal Rule of Civil Procedure 65.

30. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because at least one Plaintiff resides in this District, the proposed project is located in this District, and a substantial part of the events and threatened effects occurred or will occur here.

---

[4] USAspending.gov, *Award Profile: DE-CD0000111*, https://www.usaspending.gov/award/ASST_NON_DECD0000111_089/ (last visited Aug. 16, 2026).

31. Plaintiffs are within NEPA's zone of interests because they seek protection of concrete environmental, property-use, health, water, transportation, and recreational interests affected by the timing and scope of federal environmental review. *See* 42 U.S.C. §§ 4321, 4331.

32. Plaintiffs have no adequate remedy at law. Monetary damages cannot restore an open and informed federal decision-making process after DOE-funded site disturbance, permanent infrastructure, nonrefundable procurement, or other irreversible commitments have foreclosed reasonable alternatives. *See, e.g.*, 5 U.S.C. § 702; 42 U.S.C. § 4332(2)(C)(v); *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.").

33. Neither NEPA nor DOE's applicable regulations required Plaintiffs to pursue an administrative appeal from CX-033530 or the award decisions before filing suit, and DOE provided no such appeal. See *Darby v. Cisneros*, 509 U.S. 137, 146–47 (1993). DOE also provided no notice-and-comment process for the categorical exclusion or the nonpublic post-Inola award decisions challenged here. Plaintiffs therefore had no available administrative remedy to exhaust and no reasonable opportunity to submit comments on the defects pleaded here. See *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1048–49 (10th Cir. 2015). In all events, the pleaded defects either are apparent from CX-033530 and DOE's published project descriptions or concern nonpublic actions whose operative records remain in DOE's possession.

## STATUTORY AND REGULATORY FRAMEWORK

### A. NEPA Review and DOE's Categorical-Exclusion Rules

34. NEPA requires federal agencies to consider reasonably foreseeable environmental effects and reasonable alternatives before making major federal decisions. 42 U.S.C. § 4332.

Although NEPA does not dictate the result, the environmental information must be available while it can still affect the decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–51 (1989). Review must occur at the earliest practicable point and before an irretrievable commitment of resources. *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 717–18 (10th Cir. 2009). Planning, negotiation, or a preferred alternative alone does not establish predetermination. The violation occurs when the agency commits itself to a plan whose success depends on the NEPA review producing a particular result. *Forest Guardians v. U.S. Fish & Wildlife Service*, 611 F.3d 692, 714–15 (10th Cir. 2010). Courts defer to agency judgments about the scope and detail of the review. *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 177–91 (2025). But the review still must precede the decision.

35. For a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment, an agency shall prepare an environmental impact statement. 42 U.S.C. § 4336(b)(1). If the significance of the effect is unknown, the agency shall prepare an environmental assessment unless the action is lawfully excluded. Id. § 4336(b)(2). An agency may forgo an environmental document under its own categorical exclusion only when that exclusion covers the proposed agency action. Id. §§ 4336(a)(2), 4336e(1).

36. The challenged award actions involve substantial federal control and responsibility within 42 U.S.C. § 4336e(10)(A). DOE selected the project, established a potential federal cost share of up to $500 million, divided performance into federally controlled phases and milestones, limited the activities eligible for federal funds, required written authorization for a changed location or activities, and retained go/no-go and later-funding authority. The claims are directed to

DOE's own approvals and the project activities within its control, not every private component of the smelter.[5]

37. DOE's involvement is individualized, discretionary, and project specific. DOE did not administer a generally available tax benefit or issue a rule that Century could invoke without further agency judgment. DOE selected Project Horizon, negotiated and finalized a cooperative agreement with Century, authorized a defined $10 million first phase, determined which activities were eligible for federal support, required additional review and written authorization for any changed location or activities, and retained a go/no-go and later-funding decision.

38. Those retained authorities can alter the project's course before construction. DOE may refuse written authorization for changed-site performance, decline to accept an award milestone, or withhold federal support for a later phase. Century's chief executive has described the potential $500 million grant as "secured" and explained that funds would be released only as milestones were satisfied and eligible investments were made. The challenged federal support is therefore tied to the same named smelter and location threatening Plaintiffs' interests. This action concerns DOE's review of the project it selected, funded, and administers. It does not depend on remote effects of unrelated projects or ask the Court to decide the merits of federal aluminum policy.

39. When DOE issued CX-033530 in December 2024, 10 C.F.R. § 1021.410(b) required DOE to determine that the proposed action fit an established categorical exclusion, that no extraordinary circumstances might affect the significance of environmental consequences, and that the proposal had not been segmented to avoid the appearance of significance. CX-033530

---

[5] *See* USAspending.gov, *Award Profile: DE-CD0000111*, https://www.usaspending.gov/award/ASST_NON_DECD0000111_089/ (last visited Aug. 16, 2026).

further found that Phase 1 was not connected to or cumulatively significant with related actions and was not precluded by 40 C.F.R. § 1506.1 or 10 C.F.R. § 1021.211, which prohibited interim actions that would limit the choice of reasonable alternatives during the NEPA review process. Those findings are reviewable on the administrative record. Agencies may not evade NEPA by dividing a larger federal action into smaller components and reviewing only the least consequential component. *See Citizens' Committee to Save Our Canyons v. U.S. Forest Service*, 297 F.3d 1012, 1028–29 (10th Cir. 2002); *Utahns for Better Transportation v. U.S. Department of Transportation*, 305 F.3d 1152, 1182–83 (10th Cir. 2002), as modified on reh'g, 319 F.3d 1207 (10th Cir. 2003).

40. DOE relied on categorical exclusions A9 and B3.1.[6] A9 covered information gathering, data analysis, conceptual design, feasibility studies, document preparation, and similar activities. *See* 10 C.F.R. pt. 1021, app. A, A9. B3.1 covered limited terrestrial site characterization and environmental monitoring. *See id.* at app. B, B3.1. Neither category independently authorized construction or operation of a primary-aluminum smelter.

41. DOE announced revised NEPA implementing procedures on June 30, 2025, and an interim final rule revising 10 C.F.R. Part 1021 became effective July 3, 2025.[7] The lawfulness of those decisions must be evaluated under NEPA.

**B. APA Review and Available Relief**

42. An agency action is final when it consummates the agency's decision-making process and determines rights or obligations or produces legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Plaintiffs challenge separate defects in the completed CX and final Phase

[6] U.S. Dep't of Energy, *National Environmental Policy Act (NEPA) Determination: CX-033530* (Dec. 2, 2024), https://www.energy.gov/sites/default/files/2025-04/CX-033530.pdf.
[7] National Environmental Policy Act Implementing Procedures, 90 Fed. Reg. 29,676 (July 3, 2025); U.S. Department of Energy, *DOE NEPA Implementing Procedures* (July 13, 2026), https://www.energy.gov/nepa/articles/doe-nepa-implementing-procedures-july-13-2026.

1 award as to the activities DOE reviewed, authorized, and made eligible for funding. Plaintiffs also challenge completed post-Inola approvals, acceptances, authorizations, or funding actions that carried consequences under the award. Count VI requests preliminary and permanent injunctive relief as a remedy for the violations alleged in Counts I through V.

43. The completed Phase 1 decisions carry present legal consequences even though they do not authorize construction. CX-033530 consummated DOE's NEPA process for the defined Phase 1 package, and the finalized cooperative agreement made $10 million available for those activities without an EA or EIS. Century thereby became eligible to perform the covered work with federal support, subject to the award. Counts I through IV challenge those completed consequences; they do not depend on a future Phase 2 decision.

44. DOE publicly identified Inola as the project supported through Award No. DE-CD0000111 and continued award administration after the Inola venture was announced.[8] Count V concerns DOE's completed post-Inola acceptance or authorization of Inola as the location for continued performance under Award No. DE-CD0000111 and any attendant decision maintaining federal eligibility for changed-site or later-stage work (the "Post-Inola Award Approval").

45. Under 5 U.S.C. § 706(2), the Court shall set aside final agency action that is arbitrary, capricious, an abuse of discretion, not in accordance with law, or taken without observance of procedure required by law.

[8] See U.S. Department of Energy, Energy Department Awardee to Build First American Aluminum Smelter Since 1980 (Feb. 10, 2026), https://www.energy.gov/articles/energy-department-awardee-build-first-american-aluminum-smelter-1980; Emirates Global Aluminium, Century Aluminum Joins EGA Project to Build First U.S. Smelter in Almost 50 Years (Jan. 26, 2026), https://media.ega.ae/century-aluminum-joins-ega-project-to-build-first-us-smelter-in-almost-50-years/.

46. Counts I through IV challenge the completed CX and Phase 1 award. Count V alleges on information and belief that DOE reached the Post-Inola Award Approval and challenges that final action under § 706(2).

47. The Court may vacate and remand unlawful final agency action. An injunction requires proof of the traditional equitable factors. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–58 (2010). Those factors include imminent and irreversible environmental harm and whether later review would become a formality. Costs caused by premature commitments may be discounted. *Davis*, 302 F.3d at 1116. Plaintiffs seek an order barring federal authorization or funding of irreversible work while allowing lawful environmental review and nondestructive investigation to continue.

## FACTUAL ALLEGATIONS

### A. DOE Selected and Funded a Site-Undetermined Phase 1

48. On March 27, 2024, DOE selected Century to begin award negotiations for up to $500 million under the Industrial Demonstrations Program for a proposed low-carbon primary-aluminum smelter.[9] The funding program was directed toward commercial-scale industrial decarbonization. *See id.* at 7, 10–11, 36–37.

49. Century publicly described the selected proposal as its "Green Aluminum Smelter" project and stated that it preferred a location in Kentucky or within the Ohio/Mississippi River basins. *Id.* at 37.

[9] U.S. Dep't of Energy, *Industrial Demonstrations Program Selections National Briefing* 37 (Mar. 27, 2024), https://www.energy.gov/sites/default/files/2024-03/FINAL%20IDP%20Selection%20National%20Briefing_0.pdf.

50. Those 2024 public materials did not identify Inola, Oklahoma; EGA; a majority-EGA-owned joint venture; EGA's proprietary technology; or the later announced production capacity of approximately 750,000 metric tonnes annually. *Id.*

51. DOE and Century represented that the proposed facility would reduce carbon intensity by approximately 75 percent compared with the global average, employ state-of-the-art energy-efficient design, and be capable of operating on 100-percent renewable or nuclear electricity. Century also represented that the project would create more than 1,000 permanent United Steelworkers jobs and more than 5,500 construction jobs. *Id.*

52. Therefore, the project selected in 2024 had a defined decarbonization premise but lacked a final location, final electricity source and power contract, final site-specific design, final ownership and control structure, and site-specific environmental record. *Id.*

53. On December 2, 2024, DOE issued CX-033530 for "Project Horizon: Green Aluminum Smelter Project – Phase 1." A copy of CX-033530 is attached as Exhibit 2. DOE's own NEPA page described the proposed funding as being "in support of [Century's] project to construct" the smelter.

54. CX-033530 identified Century as the recipient, Award No. DE-CD0000111, and the project state as "TBD." Ex. 2 at 1.

55. DOE defined the covered action as Phase 1 planning, design, engineering, information gathering, procurement planning, and site characterization. The determination did not authorize construction or operation of a smelter. Ex. 2 at 1–2.

56. Covered activities included front-end engineering and design, equipment sizing and vendor identification, procurement planning, infrastructure planning for potential sites, schedule

development, geotechnical testing, biological, wetlands, cultural-resource and other surveys, identification of permits, and initial Community Benefits Plan activities. Ex. 2 at 2.

57. The determination contemplated possible deposits on long-lead equipment, although Century represented that it would not accept delivery of such equipment during Phase 1. Ex. 2 at 2.

58. DOE selected A9 and B3.1 as the applicable categorical exclusions and found no extraordinary circumstances, improper segmentation, connected action with potentially significant effects, cumulatively significant related action, or improper prejudice to later alternatives. Ex. 2 at 1–2.

59. DOE made those findings while the project state remained "TBD," before DOE publicly identified the community, watershed, airshed, neighboring residences, wetlands, wildlife resources, tribal and cultural resources, power system, transportation corridors, or other site-specific conditions. Ex. 2 at 1.

60. CX-033530 expressly stated that Phase 1 activities would inform "additional DOE NEPA review and a go/no-go decision prior to authorizing federal funding in support of subsequent project phases." Ex. 2 at 2.

61. CX-033530 further stated that any change in project activities or location was subject to additional DOE NEPA review and was not authorized for federal funding unless and until the Contracting Officer provided written authorization. Ex. 2 at 3.

62. DOE thus authorized a limited, site-undetermined Phase 1 while expressly reserving changed-location, changed-activity, and later-phase federal support for additional environmental review and written agency approval.

63. Century disclosed that it entered a Cooperative Agreement with DOE on January 10, 2025, for potential federal funding of up to $500 million.[10]

64. On January 15, 2025, DOE publicly stated that award negotiations had successfully concluded and the award had been finalized. DOE announced $10 million to begin Phase 1, out of a potential total federal cost share of up to $500 million. DOE explained that it issues an "Award Wednesday" notice only after an award has been finalized.[11]

65. DOE stated that Century would determine and announce the project site during Phase 1, complete initial engineering studies, provide reports and documentation necessary for additional NEPA review, and engage community and labor stakeholders. *See id.*

66. DOE's contemporaneous announcement confirms that, when DOE finalized Phase 1, the site had not been selected, site-specific engineering was incomplete, and further environmental review was expected before later phases. *See id.*

67. The phased award gave DOE continuing authority over the project's eligibility for federal support, including approval of a changed location or activities, acceptance of milestones, later funding, and the go/no-go decision preceding subsequent phases.[12]

68. The executed Cooperative Agreement and related amendments, approvals, milestone records, funding records, and environmental determinations are agency records. Plaintiffs requested those materials under the Freedom of Information Act, but DOE has not

[10] Century Aluminum Co., Quarterly Report (Form 10-Q), at 31 (Aug. 7, 2025), https://www.sec.gov/Archives/edgar/data/949157/000162828025038882/cenx-20250630.htm.
[11] U.S. Dep't of Energy, *Award Wednesday | January 15, 2025* (Jan. 15, 2025), https://www.energy.gov/cmei/oced/articles/award-wednesday-january-15-2025.
[12] *See id.;* U.S. Dep't of Energy, *National Environmental Policy Act (NEPA) Determination: CX-033530* 2 (Dec. 2, 2024), https://www.energy.gov/sites/default/files/2025-04/CX-033530.pdf (stating that Phase 1 activities "would inform additional DOE NEPA review and a go/no-go decision prior to authorizing federal funding in support of subsequent project phases").

produced the operative records. DOE's public statements and the recipient's disclosures nevertheless establish that DOE continued to administer the award for the fixed-site Inola project.[13]

**B. The Inola Project Took Shape Before Site-Specific Review**

69. DOE selected and initially funded a project defined publicly by two linked environmental representations: that it would "reduce carbon intensity by 75 percent" and that a redesigned substation and rectifier system would allow the smelter "to be powered 100% renewable or nuclear energy."[14]

70. On April 21, 2025, before Century was publicly announced as a participant in the Inola venture, EGA and the Office of Governor J. Kevin Stitt executed a confidential MOU concerning EGA's development of an Oklahoma smelter. Century was not a party identified in that MOU.[15]

71. The MOU did not commit the Inola facility to 100 percent renewable or nuclear electricity. It instead made the project dependent on negotiation of a specially priced power solution with Public Service Company of Oklahoma, including state-supported generation and transmission capacity, an estimated $16 million annual benefit, a discount of up to 10 percent from standard large-power rates, and "a renewable hedge on fuel of up to forty percent (40%) for a portion of the rate." *Id.* at 11.

---

[13] See U.S. Department of Energy, Energy Department Awardee to Build First American Aluminum Smelter Since 1980 (Feb. 10, 2026), https://www.energy.gov/articles/energy-department-awardee-build-first-american-aluminum-smelter-1980; Century Aluminum Co., Annual Report (Form 10-K), at 22 (Mar. 3, 2026), https://www.sec.gov/Archives/edgar/data/949157/000162828026013788/cenx-20251231.htm.

[14] *See* U.S. Dep't of Energy, *National Environmental Policy Act (NEPA) Determination: CX-033530* 2 (Dec. 2, 2024), https://www.energy.gov/sites/default/files/2025-04/CX-033530.pdf.

[15] *See Memorandum of Understanding Between the State of Oklahoma and Emirates Global Aluminium* (Apr. 21, 2025), https://www.okcommerce.gov/wp-content/uploads/Emirates-Global-Aluminium-MOU.pdf.

72. A renewable hedge on fuel for up to 40 percent of only a portion of a rate is not the same representation as a facility capable of operating on 100 percent renewable or nuclear electricity. The MOU did not repeat DOE's represented 75 percent carbon-intensity reduction, identify the generation mix that would supply the plant, or establish a binding project carbon-intensity limit. The public federal award description, however, continues to identify a 2.9-metric-ton CO2e-per-tonne target and a renewable-electricity demonstration objective. DOE's administrative record must therefore show whether the actual Inola arrangement and design can satisfy those federal objectives and what DOE analyzed or required.[16]

73. The MOU further stated that feasibility studies, environmental permitting, and air modeling were expected to begin during the second half of 2025 and continue into 2026, even as the parties developed the site, incentives, power concessions, infrastructure, and construction schedule.[17]

74. The public record does not establish that the actual Inola power arrangement will satisfy the original renewable-or-nuclear premises or produce the represented 75 percent carbon reduction. The January 2026 EGA-Century announcement continued to describe the long-term power supply as under negotiation.[18]

---

[16] USAspending.gov, *Award Profile: DE-CD0000111*, https://www.usaspending.gov/award/ASST_NON_DECD0000111_089/ (last visited Aug. 16, 2026); *see also* U.S. Dep't of Energy, *National Environmental Policy Act (NEPA) Determination: CX-033530* 2 (Dec. 2, 2024), https://www.energy.gov/sites/default/files/2025-04/CX-033530.pdf.

[17] *See Memorandum of Understanding Between the State of Oklahoma and Emirates Global Aluminium* (Apr. 21, 2025), https://www.okcommerce.gov/wp-content/uploads/Emirates-Global-Aluminium-MOU.pdf.

[18] *See* Century Aluminum Co., *Century Aluminum Joins EGA Project to Build First U.S. Smelter in Almost 50 Years* (Jan. 27, 2026), https://www.okcommerce.gov/century-aluminum-joins-ega-project-to-build-first-u-s-smelter-in-almost-50-years/ (confirming that negotiations with Public Service Company of Oklahoma regarding the long-term power supply remain ongoing).

75. On April 21, 2025, Governor J. Kevin Stitt executed a Memorandum of Understanding with EGA. The Oklahoma counterparty was identified as "The Office of Governor J. Kevin Stitt," and the agreement was marked confidential.[19]

76. Although principal commercial provisions were generally described as nonbinding, the MOU made confidentiality obligations binding and permitted equitable relief for breach. *Id.* at 7.

77. At execution, EGA had not completed due diligence confirming the site's suitability. The MOU stated that feasibility studies, environmental permitting, and air modeling were expected to begin during the second half of 2025 and continue into 2026. *Id.*

78. Nevertheless, the MOU identified an approximately 633-acre Inola site, stated that EGA was committed to selecting Oklahoma as its preferred location if specified conditions were satisfied, and contemplated preparatory site work during 2026. *Id.*

79. The MOU described a project costing approximately $4 billion and producing approximately 600,000 tons annually, with 464 reduction cells, an anode complex, a cast house, storage, and related logistics facilities. *Id.*

80. The MOU also described a special power arrangement, substantial utility discounts, approximately $545 million in contemplated tax-increment financing, a $255 million legislative incentive, a $20 million closing-fund contribution, and substantial tax benefits. *Id.*

81. On May 15, 2025, the White House included the Oklahoma smelter in commercial agreements attributed to negotiations between the United States and the United Arab Emirates.[20]

---

[19] *See Memorandum of Understanding Between the State of Oklahoma and Emirates Global Aluminium* (Apr. 21, 2025), https://www.okcommerce.gov/wp-content/uploads/Emirates-Global-Aluminium-MOU.pdf.

[20] *See* The White House, *Fact Sheet: President Donald J. Trump Secures $200 Billion in New U.S.-UAE Deals and Accelerates Previously Committed $1.4 Trillion UAE Investment* (May 15,

82. The White House stated that EGA "will invest" to develop a $4 billion primary-aluminum smelter in Oklahoma, create approximately 1,000 jobs, strengthen critical-mineral supply chains, and double existing United States production capacity. *Id.*

83. On May 16, 2025, Governor Stitt and the Oklahoma Department of Commerce announced that EGA had selected Oklahoma as its preferred location and identified the Tulsa Port of Inola.[21]

84. The federal Executive Branch and Oklahoma thus publicly identified Inola as the selected outcome while DOE's only publicly available NEPA determination remained a site-undetermined Phase 1 categorical exclusion.

85. By May 28, 2025, Oklahoma had enacted House Bill 2781, creating the Reindustrialize Oklahoma Act investment-rebate program aimed at supporting the proposed smelter. Contemporaneous reporting described the package as a $255 million incentive, a principal form of state support contemplated by the EGA-Oklahoma MOU.[22]

86. The MOU also contemplated approximately $545 million in tax-increment financing, a $20 million closing-fund contribution, utility arrangements, infrastructure support, and substantial tax benefits.

---

2025), https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-president-donald-j-trump-secures-200-billion-in-new-u-s-uae-deals-and-accelerates-previously-committed-1-4-trillion-uae-investment/.

[21] Okla. Dep't of Com., *Oklahoma Selected for $4 Billion Investment from Emirates Global Aluminium* (May 16, 2025), https://www.okcommerce.gov/oklahoma-selected-for-4-billion-investment-from-emirates-global-aluminium/.

[22] Oklahoma Legislature, *Bill Information for H.B. 2781* (showing gubernatorial approval on May 28, 2025), https://www.oklegislature.gov/BillInfo.aspx?Bill=hb2781&Session=2600; Tres Savage, *Budget Bills: Senate Recycles Vote, Advances $255 Million Aluminum Plant Incentive on Second Try*, NonDoc (May 19, 2025), https://nondoc.com/2025/05/19/budget-bills-senate-recycles-vote-advances-255-million-aluminum-plant-incentive-on-second-try/.

**C. Century Joined the Inola Project**

87. The publicly documented Inola venture was negotiated and announced by EGA and Oklahoma before Century was publicly identified as a partner. The April 2025 MOU was between EGA and the Office of Governor Stitt, and EGA's May 16, 2025, announcement described the facility as EGA's American primary-aluminum plant and stated that the Stitt Administration had worked with EGA for more than a year.[23]

88. On January 26, 2026, EGA and Century issued an announcement titled "Century Aluminum Joins EGA Project to Build First U.S. Smelter in Almost 50 Years." The announcement described the Inola plant as "previously announced by EGA," and EGA's chief executive stated that EGA welcomed Century as a partner.[24]

89. The public record does not establish whether Century participated in nonpublic discussions before January 2026. It does establish the relevant public sequence: EGA negotiated and announced the Oklahoma project; Century later publicly joined that project as a 40 percent minority owner; and DOE thereafter publicly linked the Century award to the EGA-controlled Inola venture. The public federal award record continues to identify Century as the legal recipient.

90. Under the announced joint-development arrangement, EGA would own 60 percent, and Century would own 40 percent of the proposed Inola venture. *Id.*

---

[23] *See Memorandum of Understanding Between the State of Oklahoma and Emirates Global Aluminium* (Apr. 21, 2025), https://www.okcommerce.gov/wp-content/uploads/Emirates-Global-Aluminium-MOU.pdf; Okla. Dep't of Com., *Oklahoma Selected for $4 Billion Investment from Emirates Global Aluminium* (May 16, 2025), https://www.okcommerce.gov/oklahoma-selected-for-4-billion-investment-from-emirates-global-aluminium/; Emirates Global Aluminium, *EGA Progresses Plans to Build First New Primary Aluminium Production Plant in the US Since 1980 in Oklahoma* (May 16, 2025), https://media.ega.ae/ega-progresses-plans-to-build-first-new-primary-aluminium-production-plant-in-the-us-since-1980-in-oklahoma/.

[24] *See* Emirates Global Aluminium, *Century Aluminum Joins EGA Project to Build First U.S. Smelter in Almost 50 Years* (Jan. 26, 2026), https://media.ega.ae/century-aluminum-joins-ega-project-to-build-first-us-smelter-in-almost-50-years/.

91. EGA is owned by Mubadala Investment Company of Abu Dhabi and Investment Corporation of Dubai and describes itself as the largest company jointly owned by those two Emirates. EGA's 60-percent interest therefore places majority ownership and control of the Inola venture in a company owned by UAE sovereign investment entities.[25]

92. The April 2025 MOU described production of approximately 600,000 tons annually. The January 2026 joint-venture announcement described production of approximately 750,000 metric tonnes annually and characterized the facility as larger than previously envisioned.[26]

93. The companies further announced that the plant would use EGA's proprietary EX technology and that both companies would focus their United States greenfield-development efforts exclusively on Inola.[27]

94. Century's public filings acknowledge that EGA's majority interest limits Century's unilateral control and that Century may be unable to implement actions it considers favorable if EGA disagrees.[28]

95. The project now associated with DOE's award is materially different from the proposal DOE selected and the Phase 1 project DOE categorically excluded. The current project

---

[25] *See* Emirates Global Aluminium, *About Us*, https://www.ega.ae/en/about-us (last visited Aug. 16, 2026); Mubadala Investment Company, *Who We Are*, https://www.mubadala.com/en/who-we-are/about-mubadala (last visited Aug. 16, 2026).

[26] *See Memorandum of Understanding Between the State of Oklahoma and Emirates Global Aluminium* (Apr. 21, 2025), https://www.okcommerce.gov/wp-content/uploads/Emirates-Global-Aluminium-MOU.pdf; Emirates Global Aluminium, *Century Aluminum Joins EGA Project to Build First U.S. Smelter in Almost 50 Years* (Jan. 26, 2026), https://media.ega.ae/century-aluminum-joins-ega-project-to-build-first-us-smelter-in-almost-50-years/.

[27] *See* Emirates Global Aluminium, *Century Aluminum Joins EGA Project to Build First U.S. Smelter in Almost 50 Years* (Jan. 26, 2026), https://media.ega.ae/century-aluminum-joins-ega-project-to-build-first-us-smelter-in-almost-50-years/.

[28] Century Aluminum Co., Annual Report (Form 10-K), at 12–13 (Mar. 3, 2026), https://www.sec.gov/Archives/edgar/data/949157/000162828026013788/cenx-20251231.htm.

has a fixed Oklahoma site, a new majority and controlling participant, a different ownership structure, a larger announced capacity, EGA technology, an Oklahoma-specific power arrangement under negotiation, and an exclusive corporate commitment to Inola.

**D. DOE Linked the Award and $500 Million to Inola**

96. By February 2026, DOE publicly described the Inola facility as a project supported through a DOE grant.[29]

97. DOE made that announcement after Inola had been selected, the project participants had committed their U.S. Greenfield-development efforts to that site, site-specific engineering was underway, and an air-quality construction-permit application had been submitted. *Id.*

98. DOE's public statement links Award No. DE-CD0000111 to the fixed Inola facility. Public materials do not reveal whether DOE issued a written location-change authorization, accepted a milestone, made a Phase 2 go/no-go decision, or authorized construction. Based on DOE's statement, continued award administration, reported post-Inola revisions, and facts within DOE's possession, Plaintiffs allege on information and belief that DOE accepted or authorized continued Inola-specific performance.[30]

99. DOE continued administering the award after site selection and publicly identified Inola as the grant-supported project. The nonpublic award record will show whether DOE accepted the site-selection milestone, approved a changed location or activity, accepted Inola-specific performance, or advanced the recipient into a later budget period.

[29] *See* U.S. Dep't of Energy, *Energy Department Awardee to Build First American Aluminum Smelter Since 1980* (Feb. 10, 2026), https://www.energy.gov/articles/energy-department-awardee-build-first-american-aluminum-smelter-1980.

[30] USAspending.gov, *Award Profile: DE-CD0000111*, https://www.usaspending.gov/award/ASST_NON_DECD0000111_089/. *Cf.* U.S. Dep't of Energy, *National Environmental Policy Act (NEPA) Determination: CX-033530* (Dec. 2, 2024), https://www.energy.gov/sites/default/files/2025-04/CX-033530.pdf.

100. To the extent DOE accepted the location, authorized changed activities, accepted a milestone, or approved a later budget period, those actions produced legal consequences by permitting site-specific performance, maintaining eligibility for federal funding, or advancing the project toward later milestones and construction. The operative agency records are not publicly available, but they should be part of the administrative record in this case.

101. DOE's January 2025 announcement described $10 million for a site-undetermined Phase 1, with a potential federal share of up to $500 million and additional review and a go/no-go decision before subsequent phases.[31]

102. On February 10, 2026, DOE stated that OCED had "awarded $500 million to advance construction" of the Inola smelter. DOE celebrated progress toward construction and described the facility as supported through a DOE grant.[32]

103. Century has likewise disclosed that the Cooperative Agreement provides potential federal funding of up to $500 million and that it intends the DOE funding to support the Inola facility it plans to construct, own, and operate with EGA.[33]

104. DOE's February 2026 announcement, USAspending's report of a $500 million total obligation, the post-Inola award revisions, and Century's disclosures establish continued federal administration of Award No. DE-CD0000111 after the project became fixed at Inola.[34]

---

[31] *See* U.S. Dep't of Energy, *Award Wednesday | January 15, 2025* (Jan. 15, 2025), https://www.energy.gov/cmei/oced/articles/award-wednesday-january-15-2025.
[32] *See* U.S. Dep't of Energy, *Energy Department Awardee to Build First American Aluminum Smelter Since 1980* (Feb. 10, 2026), https://www.energy.gov/articles/energy-department-awardee-build-first-american-aluminum-smelter-1980.
[33] Century Aluminum Co., Annual Report (Form 10-K), at 22 (Mar. 3, 2026), https://www.sec.gov/Archives/edgar/data/949157/000162828026013788/cenx-20251231.htm.
[34] See U.S. Department of Energy, Energy Department Awardee to Build First American Aluminum Smelter Since 1980 (Feb. 10, 2026), https://www.energy.gov/articles/energy-department-awardee-build-first-american-aluminum-smelter-1980; USAspending.gov, Award Profile: DE-CD0000111,

105. CX-033530 did not authorize federal support for construction, a changed project location, changed activities, or later phases. Any DOE action providing that support required the additional environmental review and written authorization applicable to the actual federal action.

**E. The Project Changed**

106. DOE's December 2024 and January 2025 materials repeatedly described the award as a Green Aluminum Smelter and an industrial-decarbonization demonstration expected to avoid approximately 75 percent of emissions from a traditional smelter.[35]

107. DOE's February 10, 2026, announcement concerning the Inola project did not repeat the earlier 75 percent carbon-reduction representation or state that the facility would use 100-percent renewable or nuclear electricity. Instead, DOE emphasized domestic production, reduced reliance on imports, tariffs, national defense, and the U.S.-UAE strategic relationship. The public federal award description nevertheless continues to identify quantified carbon-intensity and renewable-electricity demonstration objectives.[36]

108. DOE's changed public emphasis does not establish that it abandoned the award's environmental objectives. But the EGA-Oklahoma power terms, unresolved PSO negotiations, changed ownership and control, larger capacity, and EGA technology raise a question the

---

https://www.usaspending.gov/award/ASST_NON_DECD0000111_089/; Century Aluminum Co., Annual Report (Form 10-K), at 22 (Mar. 3, 2026), https://www.sec.gov/Archives/edgar/data/949157/000162828026013788/cenx-20251231.htm.

[35] *See* U.S. Dep't of Energy, *Award Wednesday | January 15, 2025* (Jan. 15, 2025), https://www.energy.gov/cmei/oced/articles/award-wednesday-january-15-2025.

[36] See U.S. Department of Energy, Energy Department Awardee to Build First American Aluminum Smelter Since 1980 (Feb. 10, 2026), https://www.energy.gov/articles/energy-department-awardee-build-first-american-aluminum-smelter-1980; USAspending.gov, Award Profile: DE-CD0000111, https://www.usaspending.gov/award/ASST_NON_DECD0000111_089/ (last visited Aug. 16, 2026).

administrative record must answer: whether the actual electricity supply and process design can meet the published objectives and what analysis or enforceable conditions DOE adopted.

109. DOE could not rely on the environmental premise of the Century Green Aluminum Smelter Project while supporting a materially changed Inola venture without examining whether the published objectives remained achievable and enforceable or whether DOE had accepted a different project.

110. In February 2026, EGA and Century announced that they had selected Bechtel, a global engineering and construction firm, to conduct "preparatory engineering and early execution planning" for the Inola facility.[37]

111. Bechtel's announced scope includes plant design, definition of technical and infrastructure requirements, evaluation of modularization and pre-assembly strategies to improve construction efficiency, and logistics planning for transportation of materials by road and river. *Id.*

112. The companies stated that the work would prepare the project for a final investment decision and the start of construction by the end of 2026. ERM was identified as coordinating environmental, social, public-consultation, and permitting work.[38]

113. On February 9, 2026, the Oklahoma Department of Environmental Quality received Oklahoma Primary Aluminum's application for Permit No. 2026-0100-C PSD, a Tier III major-source construction permit for the proposed Inola facility.[39]

---

[37] Bechtel, *Bechtel Selected for Preparatory Engineering on Oklahoma Aluminum Project* (Feb. 10, 2026), https://www.bechtel.com/press-releases/bechtel-selected-for-preparatory-engineering-on-oklahoma-aluminum-project/.

[38] Emirates Global Aluminium, *Bechtel to Lead Preparatory Engineering Work on Oklahoma Aluminum Project* (Feb. 10, 2026), https://media.ega.ae/bechtel-to-lead-preparatory-engineering-work-on-oklahoma-aluminum-project/.

[39] Oklahoma Department of Environmental Quality, Permit No. 2026-0100-C PSD, https://applications.deq.ok.gov/PermitsPublicReview/permitinformation.aspx?id=1072402 (last visited Aug. 16, 2026).

114. The project now has a fixed site, defined ownership structure, announced capacity and technology, a site-specific engineering contractor, road-and-river logistics planning, a pending major-source air-permit application, active power negotiations, and a publicly announced construction target.

115. As of August 24 2026, a search of DOE's public NEPA-document and categorical-exclusion pages located CX-033530, which lists the project state as "TBD," but did not locate an Inola-specific CX, EA, FONSI, EIS, Record of Decision, written location authorization, or other published environmental determination corresponding to the actual project and later federal decisions alleged above.[40]

116. Federal and state officials have repeatedly presented Inola as the selected project and a priority for domestic aluminum production. The White House included the proposed smelter in announced U.S.-UAE commercial agreements; Oklahoma announced Inola as the preferred location; and DOE later described the project as grant-supported and stated that $500 million had been awarded to advance construction.[41]

---

[40] See U.S. Department of Energy, Categorical Exclusion Determinations, https://www.energy.gov/nepa/categorical-exclusion-cx-determinations (last visited Aug. 16, 2026); U.S. Department of Energy, National Environmental Policy Act (NEPA) Determination: CX-033530 (Dec. 2, 2024), https://www.energy.gov/sites/default/files/2025-04/CX-033530.pdf.

[41] *See* The White House, *Fact Sheet: President Donald J. Trump Secures $200 Billion in New U.S.-UAE Deals and Accelerates Previously Committed $1.4 Trillion UAE Investment* (May 15, 2025), https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-president-donald-j-trump-secures-200-billion-in-new-u-s-uae-deals-and-accelerates-previously-committed-1-4-trillion-uae-investment/; Oklahoma Department of Commerce, *Oklahoma Selected for $4 Billion Investment from Emirates Global Aluminium* (May 16, 2025), https://www.okcommerce.gov/oklahoma-selected-for-4-billion-investment-from-emirates-global-aluminium/; U.S. Department of Energy, *Energy Department Awardee to Build First American Aluminum Smelter Since 1980* (Feb. 10, 2026), https://www.energy.gov/articles/energy-department-awardee-build-first-american-aluminum-smelter-1980.

117. That political commitment became plain in the 2026 Oklahoma governor's race. At a March candidate forum, Mike Mazzei criticized the project's public subsidies, describing "a tax incentive package of a billion dollars for a Mid-East aluminum plant" that had promised 1,000 jobs. Yet on the day President Trump endorsed him, Mazzei publicly pledged support for the smelter only hours before the endorsement. Mazzei later told The Frontier that an April interview with a senior Trump official in the West Wing helped him secure the endorsement. He said he changed his position after the Trump Administration gave him information about the project's finances, national-security role, and environmental safety.[42]

118. President Trump then put the Inola project squarely into the governor's race. One week before the runoff election, he urged Oklahomans to vote for Mazzei, attacked Attorney General Drummond as a "fake Republican" for seeking to stop the plant, and called the still-unbuilt facility "one of the best projects ever conceived or built."[43]

119. Mazzei then promised complete safety even though the state permit was still under review. On August 17, 2026, he said nearby residents could have "100% confidence" that the water and air would be completely safe for people, cattle, and farms. The Oklahoma Department of Environmental Quality, however, told The Frontier that it was still evaluating the permit application and that actual emissions would depend on production rates, control-equipment performance, and operating hours. The Frontier also reported that Mazzei gave no supporting

[42] Brianna Bailey & Clifton Adcock, With Trump's Backing, Mike Mazzei Embraced the Smelter. Inola Residents Aren't Convinced, The Frontier (Aug. 21, 2026), https://www.readfrontier.org/stories/with-trumps-backing-mike-mazzei-embraced-the-smelter-inola-residents-arent-convinced/.

[43] Donald J. Trump, Truth Social post (Aug. 18, 2026), https://truthsocial.com/@realDonaldTrump/posts/117116197583802302.

documentation for the 0.45-pound-per-ton fluoride-emission figure he cited; the pending application sought limits that could allow approximately 425 tons of fluoride emissions annually.[44]

120. This shows the President treating the Inola smelter as a settled political and economic objective—and politically intervening against those trying to stop it—while DOE's only disclosed NEPA review still listed the location as "TBD." Each public, financial, institutional, and political commitment made it more costly to choose a different site or design, add mitigation, reduce the project's scale, or choose no action.[45]

121. NEPA review must remain capable of influencing DOE's decision; it cannot merely justify a decision already made. *Forest Guardians*, 611 F.3d at 712–15. The announcements, preferred site, and negotiations do not establish predetermination by themselves. The question is whether DOE used or surrendered its award powers in a manner that committed federal support to Inola before review and then invoked the resulting commitments as a reason to deny effective relief. *See Davis*, 302 F.3d at 1112–13, 1116; *Sierra Club v. Marsh*, 872 F.2d 497, 500–01 (1st Cir. 1989).

**F. The Inola Site and Environmental Concerns**

122. The proposed smelter would be built at the Tulsa Port of Inola, a 2,200-acre industrial park with rail and barge access. The Inola port property lies along the Verdigris River, part of the McClellan-Kerr Arkansas River Navigation System. The April 2025 MOU identified a roughly 633-acre parcel within the City of Inola for a land-option-to-purchase agreement with the City of Tulsa-Rogers County Port Authority.[46]

[44] Bailey & Adcock, supra note 43.
[45] *See Davis*, 302 F.3d at 1115–16; *Sierra Club v. Marsh*, 872 F.2d 497, 500–01 (1st Cir. 1989).
[46] See Memorandum of Understanding Between Emirates Global Aluminium PJSC and the Office of Governor J. Kevin Stitt, Schedule 1, at 10–11 (Apr. 21, 2025), https://www.okcommerce.gov/wp-content/uploads/Emirates-Global-Aluminium-MOU.pdf;

123. The parcel and plant footprint are not necessarily identical. The Oklahoma Attorney General has publicly described the facility as occupying about 350 acres along the Verdigris River and lying within about three miles of Inola's schools, homes, and farms. The developers now describe a facility capable of producing up to 750,000 metric tons of aluminum annually—enough, by their account, to more than double current domestic production.[47]

124. The project is a full primary-aluminum production complex, not a single building. The 2025 MOU's then-contemplated 600,000-ton configuration included a potline with 464 reduction cells; rectifiers, gas-treatment centers, pot-tending machines, and ancillary shops; a carbon-anode area with a green mill, baking kiln, and rodding shop; a casthouse; and raw-material and finished-product storage and logistics. Subsequent announcements increased planned capacity to 750,000 metric tons per year, selected EGA's EX technology, and established a 60-percent EGA/40-percent Century venture focused on Inola.[48]

125. The proposed Inola smelter presents site-specific environmental concerns that could not have been analyzed when DOE issued CX-033530 with the project state listed as "TBD." Primary-aluminum reduction plants are regulated for total fluorides and other pollutants under the

---

Tulsa Ports, Tulsa Port of Inola, https://tulsaports.com/locate-here/tulsa-port-of-inola/ (last visited Aug. 18, 2026); Tulsa Ports, The Tulsa Port Doubles Its Land Holdings (Oct. 30, 2019), https://tulsaports.com/tulsa-port-doubles-its-land-holdings/.

[47] Oklahoma Office of the Attorney General, Drummond Files Action to Block Inola Aluminum Smelter (June 2, 2026), https://oklahoma.gov/oag/news/newsroom/2026/june/drummond-files-action-to-block-inola-aluminum-smelter.html; Oklahoma Primary Aluminum, Our Project, https://www.oklahomaprimaryaluminum.com/en/about-us/our-project (last visited Aug. 18, 2026).

[48] See Memorandum of Understanding Between Emirates Global Aluminium PJSC and the Office of Governor J. Kevin Stitt, Schedule 1, at 8 (Apr. 21, 2025), https://www.okcommerce.gov/wp-content/uploads/Emirates-Global-Aluminium-MOU.pdf; Oklahoma Department of Commerce, Century Aluminum Joins EGA Project to Build First U.S. Smelter in Almost 50 Years (Jan. 27, 2026), https://www.okcommerce.gov/century-aluminum-joins-ega-project-to-build-first-u-s-smelter-in-almost-50-years/.

federal new-source standard, 40 C.F.R. Part 60, Subpart S, and for hazardous air pollutants under 40 C.F.R. Part 63, Subpart LL.[49]

126. The project's announced capacity, rural location, and proximity to residences, agricultural uses, livestock operations, roads, water resources, and cultural resources require reasoned consideration of air emissions and dispersion, deposition, surface water and groundwater, stormwater, wetlands, threatened and endangered species, cultural resources, waste management, transportation, noise, lighting, electrical infrastructure, accident risks, and the combined reasonably foreseeable effects of components of the DOE-supported project.

127. Fluoride emissions and deposition require site-specific analysis because primary-aluminum smelters are regulated for total fluorides and published public-health materials identify smelters as possible sources of elevated airborne fluoride. Whether the facility would create a material deposition or exposure pathway for forage, soil, ponds, surface water, livestock, or nearby landowners depends on emissions, controls, dispersion and deposition modeling, monitoring, and mitigation that do not appear in the present public record.[50]

128. These are specific, testable concerns. In the parallel action over this project, the State represented - relying on its engineering expert, Dr. Ranajit (Ron) Sahu - that the air-permit application assumed capture efficiencies of 99 to 100 percent and a control efficiency of 99.96 percent that were "unsupported by any engineering analysis"; that modestly lower real-world performance would drive total fluoride emissions "well above 1,000 tons per year"; and that even

---

[49] Dep't of Energy, *National Environmental Policy Act (NEPA) Determination: CX-033530* (Dec. 2, 2024), https://www.energy.gov/sites/default/files/2025-04/CX-033530.pdf.

[50] *See* 40 C.F.R. Part 60, Subpart S; 40 C.F.R. Part 63, Subpart LL; Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, *Toxicological Profile for Fluorides, Hydrogen Fluoride, and Fluorine* 1, 3, 7–9 (2003), https://www.ncbi.nlm.nih.gov/books/NBK597862/.

the application's estimate of roughly 425 tons per year would exceed every plant reflected in the most recent National Emissions Inventory. The State further represented that the highest-emitting primary-aluminum smelter in that inventory reported roughly 131 tons per year.[51]

129. The State also represented that DEQ had placed the application in "Pending Facility Action" status and required corrections or supplementation to the best-available-control-technology analysis, emissions calculations, and air-dispersion modeling. According to the filed motion, the applicant's own potroom calculations showed total fluoride emissions of 1.514 pounds per ton of aluminum, approximately fifty percent above the 1.02-pound-per-ton limit the applicant proposed. Those remain the State's allegations and expert opinions; they have not been adjudicated and do not substitute for DOE's administrative record. They do, however, identify concrete technical disputes about emissions, control performance, dispersion, deposition, and mitigation that DOE must confront before accumulated commitments narrow or eliminate the no-action alternative and other reasonable alternatives.[52]

130. If they are part of the proposed federal action or within DOE's control and responsibility, the project's related facilities also require analysis of water demand and supply, wastewater, stormwater, groundwater, spent-potliner management, other solid and hazardous waste streams, high-voltage substations and transmission facilities, gas or generation infrastructure, roads, rail, port and river logistics, and their combined effects in the Inola area.[53]

---

[51] Plaintiff's Motion for Preliminary Injunction and Brief in Support at 15–16, *State of Oklahoma ex rel. Drummond v. Century Aluminum Co.*, No. 4:26-cv-00450-SEH-SH, Doc. 19 (N.D. Okla. Aug. 11, 2026) (citing Declaration of Dr. Ranajit (Ron) Sahu ¶¶ 13–15, 19–22 & tbls. 1–2).
[52] *Id.* at 6–7 (citing DEQ Notice of Pending Facility Action and Sahu Decl. ¶ 17).
[53] 40 C.F.R. § 261.32 ("Spent potliners from primary aluminum reduction.").

131. DOE must examine the actual site and configuration before federal support contributes to irreversible commitments. DOE cannot continue to treat the project as the same site-neutral information-gathering exercise categorically excluded in December 2024.

**G. DOE's Continuing Control and No Site-Specific Review**

132. USAspending reports a $500 million federal obligation under Award No. DE-CD0000111, and Century describes potential funding of up to $500 million as a material project resource. The public record does not identify a corresponding payment or outlay, and the reported obligation alone does not establish a Phase 2 go/no-go decision or construction authorization. DOE nevertheless retained authority over changed locations and activities, milestone acceptance, budget periods, reimbursable work, and later funding.[54]

133. Phase 1 included front-end design, equipment sizing, vendor identification, procurement planning, infrastructure planning, scheduling, geotechnical work, and site surveys.[55] As implemented for Inola, those activities advanced selection and design of a particular site and configuration and included the possibility of approved deposits on long-lead equipment.

134. Since DOE's 2024 finding that Phase 1 would not prejudice alternatives, the project participants have committed exclusively to Inola, increased capacity, selected EGA technology, engaged Bechtel for site-specific plant design, early execution planning, modularization, infrastructure definition, and logistics, applied for a major-source construction permit, negotiated site-specific power terms, and announced construction by the end of 2026.

---

[54] USAspending.gov, *Award Profile: DE-CD0000111*, https://www.usaspending.gov/award/ASST_NON_DECD0000111_089/.
[55] U.S. Dep't of Energy, *National Environmental Policy Act (NEPA) Determination: CX-033530* (Dec. 2, 2024), https://www.energy.gov/sites/default/files/2025-04/CX-033530.pdf.

135. Oklahoma has simultaneously committed or contemplated hundreds of millions of dollars in direct incentives, tax benefits, TIF financing, utility concessions, and supporting infrastructure. Federal, state, corporate, and diplomatic announcements have repeatedly treated Inola as the selected outcome.

136. State and private commitments are not federal action. They matter where DOE authorized, funded, reimbursed, required, accepted, or relied on them as award performance, and they bear on whether DOE's remaining choices are real. DOE had to consider whether the Phase 1 activities it authorized, together with any later federal support for Inola, would prejudice the alternatives reserved for later review.

137. Project momentum cannot operate only in DOE's favor. If DOE retains authority to withhold or condition support, restrict reimbursable activities, require mitigation, alter the project's scope or timing, or decline later phases, then environmental review and targeted relief remain effective. If DOE has already surrendered those choices through completed award actions, that surrender supports the premature-commitment claim; it does not excuse it.

138. CX-033530 required additional DOE NEPA review and written authorization for changes in project location or activities and contemplated a go/no-go decision before later-phase funding.

139. Multiple changes were subsequently made to the project: the project changed to Inola; the controlling participant and ownership structure changed; Century publicly joined a project previously announced by EGA; the announced capacity became larger; technology changed; the MOU did not guarantee the original 100 percent renewable-or-nuclear capability; the PSO power arrangement remained under negotiation; and the project acquired Inola-specific engineering, infrastructure planning, permitting, contemplated subsidies, and a construction target.

140. DOE then publicly linked its grant to the transformed Inola project and stated that $500 million had been awarded to advance construction.

141. As of August 24, 2026, DOE's public NEPA pages identified no Inola-specific categorical exclusion, environmental assessment, finding of no significant impact, environmental impact statement, record of decision, or comparable environmental determination for the fixed-site project. DOE's response to Plaintiffs' Freedom of Information Act request included no such determination. DOE also has not publicly explained how the majority-EGA project's actual power arrangement and process design will satisfy the published carbon-intensity and renewable-electricity objectives.[56]

142. The Cooperative Agreement and agency records reflecting any site review or authorization, award administration, funding, milestone, and environmental-review decisions are within DOE's possession and form the administrative record for this action.

**H. Threatened Harm and Need for Relief**

143. The companies have publicly targeted construction to begin by the end of 2026, subject to completion of engineering, power arrangements, a definitive joint-venture agreement, permitting, financing, and final investment approval.[57]

144. The risk is tied to a public timetable, not some indefinite future date. The developers have retained Bechtel for preparatory engineering and early execution planning, submitted a Tier III major-source construction-permit application, begun site-specific power and financing work,

[56] See U.S. Department of Energy, Categorical Exclusion Determinations, https://www.energy.gov/nepa/categorical-exclusion-cx-determinations (last visited Aug. 16, 2026); U.S. Department of Energy, National Environmental Policy Act (NEPA) Determination: CX-033530 (Dec. 2, 2024), https://www.energy.gov/sites/default/files/2025-04/CX-033530.pdf.
[57] Century Aluminum Co., *Q2 2026 Earnings Call*, 19:49 (Aug. 6, 2026), https://www.marketbeat.com/earnings/reports/2026-8-6-century-aluminum-stock/.

and publicly tied those efforts to a final investment decision and groundbreaking by year-end 2026. The remaining contingencies may affect whether the developers meet that schedule, but they do not sever the connection between the pleaded risk and DOE's project-specific support.

145. Engineering, equipment planning, infrastructure planning, air permitting, power negotiations, logistics planning, and final-investment-decision work are underway.

146. As the project moves toward procurement, site preparation, permanent infrastructure, and final investment, the financial and political cost of selecting another site, reducing capacity, changing design, imposing conditions, or choosing no action increases.

147. Once federally supported clearing, grading, excavation, foundations, permanent utilities, roads or rail facilities, project-specific equipment delivery, or similar site-disturbing work begins, a later paper review cannot fully restore an open decision or prevent injury to Plaintiffs' use and enjoyment of their properties, water sources, access roads, and surrounding areas. Plaintiffs do not allege that preliminary engineering, standing alone, produces all of those physical effects. Their procedural injury occurs when DOE's uninformed project-specific decisions increase the risk that irreversible work will proceed before alternatives are fairly considered; the threatened physical injury arises at the announced transition from study to construction.

148. An order maintaining the line between nondestructive study and post-Phase-1 implementation would preserve the status quo, allow DOE to study the actual project, and keep federal support from contributing to irreversible work before lawful review. Plaintiffs seek that relief under the traditional equitable factors.

## STANDING TO CHALLENGE FINAL AGENCY ACTION

149. Under Tenth Circuit law, a procedural NEPA plaintiff alleges injury in fact by showing that uninformed agency decisionmaking created an increased risk of actual, threatened,

or imminent environmental harm and that the increased risk threatens a concrete interest through a geographic nexus to or actual use of the affected area. *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 449–52 (10th Cir. 1996); *Rocky Mountain Peace & Justice Center v. U.S. Fish & Wildlife Service*, 40 F.4th 1133, 1151–56 (10th Cir. 2022). Plaintiffs satisfy those requirements as follows.

150. Each Plaintiff has concrete interests, as alleged above, in Hill's, Sanders's, and Brown's residences and in Bethea's property and cabin, as well as in water, roads, air, quiet, darkness, views, wildlife, agricultural uses, and the surrounding area. The threatened effects are geographically particularized and would affect places each Plaintiff currently uses.

151. Each Plaintiff's use is current and recurring, not an abstract environmental concern or an indefinite plan to visit the area. Hill resides approximately 0.07 miles from the proposed project boundary; Bethea regularly uses property and a cabin approximately 0.38 miles away; Sanders resides approximately 1.6 miles away; and Brown resides approximately 1.8 miles away.

152. The procedural requirements at issue are designed to protect those concrete interests by requiring environmental review before DOE approves a site, releases later federal support, or permits activities that may cause environmental consequences or foreclose alternatives.

153. The absence or unlawful limitation of timely review increases the risk that DOE will support a fixed-site project without informed consideration of location, scale, ownership and control, technology, electricity source and generation mix, greenhouse-gas performance, infrastructure, water demands, pollution controls, mitigation, and the no-action alternative.

154. DOE's challenged decisions are specific to this project. Phase 1 authorized site selection, design, procurement planning, infrastructure planning, and site characterization for this identified smelter; DOE retained authority over the changed location, changed activities, later

funding, and go/no-go decision. The alleged procedural omission therefore concerns federal decisions for the same fixed-site project from which the threatened effects would arise.

155. Plaintiffs' procedural injuries are fairly traceable to DOE's public decision to link the award to Inola, its continued administration of federal support, and the approval or allowance of Inola-specific performance alleged subject to the administrative record. Federal financial assistance materially supports the project, and DOE retains authority to withhold, condition, alter, or discontinue later support.

156. Plaintiffs' injuries supporting Counts I through IV arise from federally supported Phase 1 activities that selected, designed for, procured for, or planned infrastructure for a particular project configuration before the additional review reserved by DOE, including any approved long-lead commitments and other activities that materially prejudiced reasonable alternatives.

157. Traceability does not depend on DOE being the sole cause of the project or having power to prohibit construction funded entirely by others. DOE's decisions authorized a defined path of project-specific work, and its potential $500 million support remains material before final investment and groundbreaking. An order vacating unlawful authorizations and preventing federal support for irreversible work would remove or condition that support while DOE reconsiders the actual project.

158. The requested relief would redress Plaintiffs' injuries because vacatur and remand would restore DOE's ability and duty to evaluate the actual project before further federal implementation, and an injunction would prevent federal payments, reimbursements, or authorizations from supporting irreversible work during that review.

159. Lawful review could result in a different site, reduced capacity, different technology, binding low-carbon requirements, different electricity arrangements, additional

pollution controls, construction restrictions, water protections, transportation mitigation, other conditions on federal funding, denial of later federal support, or selection of the no-action alternative. Plaintiffs need not prove which lawful outcome DOE would select.

160. For procedural injury, Plaintiffs need not prove that NEPA compliance would change DOE's ultimate decision; a favorable decision requiring compliance redresses the injury of uninformed decisionmaking. *Committee to Save the Rio Hondo*, 102 F.3d at 452; *Rocky Mountain Peace & Justice Center*, 40 F.4th at 1155–56.

161. Each Plaintiff asserts standing in his or her own right and seeks declaratory and injunctive relief to protect concrete, geographically particularized environmental, property-use, water, transportation, and quality-of-life interests. No Plaintiff seeks damages.

162. CX-033530 and the final Phase 1 award are final agency actions as to Phase 1 because DOE completed the review for the covered activities, authorized those activities, and made federal funds available for them. They are not alleged to be final authorization to construct the smelter.

163. Plaintiffs allege on information and belief that DOE consummated the Post-Inola Award Approval by accepting or authorizing Inola as the location for continued performance under the award and maintaining or advancing federal eligibility for changed-site or later-stage work.

164. The Post-Inola Award Approval carries present legal consequences under the award because it determines whether the recipient may continue Inola-specific performance, satisfy a site-selection or other award milestone, enter or remain in an eligible budget period, or claim federal support for changed-site or later-stage work. The certified administrative record will identify the exact instrument and consequences.

165. Counts I through IV are ripe because they challenge a completed categorical exclusion and final Phase 1 award. Count V challenges completed post-Inola actions carrying consequences under the award, as alleged from DOE's public linkage of the award to Inola, continued award administration, reported obligation and revisions, and the recipient's disclosures. Waiting until construction begins would defeat NEPA's timing requirement.

## COUNT I

### APA AND NEPA - UNLAWFUL APPLICATION OF CATEGORICAL EXCLUSIONS A9 AND B3.1 TO PHASE 1 (5 U.S.C. §§ 702, 704, 706(2); 42 U.S.C. §§ 4332, 4336)

166. Plaintiffs incorporate the preceding allegations as though fully set forth herein.

167. DOE's issuance of CX-033530 and final authorization and funding of Phase 1 constitute final agency action as to the activities DOE reviewed, authorized, and made eligible for federal funds. Under 10 C.F.R. § 1021.410(b)(1), DOE could apply a categorical exclusion only if the proposed action fit a class of actions listed in Appendix A or B.

168. Phase 1 was not limited to abstract study. It included site selection, front-end design, equipment sizing, vendor identification, procurement planning, infrastructure planning, scheduling, geotechnical work, site surveys, and the possibility of approved deposits on long-lead equipment, all undertaken to advance construction of the proposed smelter.

169. DOE failed to articulate a reasoned basis for treating that integrated package as information gathering, conceptual design, feasibility study, document preparation, limited terrestrial site characterization, or environmental monitoring within A9 and B3.1. In particular, CX-033530 did not explain how implementation-oriented engineering, vendor and equipment selection, procurement and infrastructure planning, and possible long-lead commitments fit those categories.

170. DOE therefore acted arbitrarily, capriciously, contrary to NEPA, and without observance of required procedure by applying A9 and B3.1 to the full Phase 1 action. CX-033530 and the Phase 1 award should be declared unlawful, vacated, and remanded insofar as they authorized or funded activities outside the lawful scope of those categorical exclusions.

## COUNT II

### APA AND NEPA - UNREASONED FINDING OF NO EXTRAORDINARY CIRCUMSTANCES (5 U.S.C. §§ 702, 704, 706(2); 42 U.S.C. §§ 4332, 4336)

171. Plaintiffs incorporate the preceding allegations as though fully set forth herein.

172. DOE's issuance of CX-033530 and final authorization and funding of Phase 1 constitute final agency action. Under 10 C.F.R. § 1021.410(b)(2), DOE could apply a categorical exclusion only after determining that no extraordinary circumstances related to the proposal might affect the significance of its environmental consequences.

173. DOE made that finding while identifying the project state as "TBD." The effects of geotechnical work, site selection, infrastructure planning, power planning, and other Phase 1 activities depended on the location ultimately selected. Without a site, DOE lacked a reasoned basis for excluding unique or unknown risks and unresolved conflicts concerning alternative locations and uses of resources.

174. Because site selection was an express Phase 1 activity, the absence of a selected site did not render location irrelevant. It meant DOE was authorizing a federally supported choice among locations while lacking the information needed to determine whether choosing and characterizing a particular site presented extraordinary circumstances or unresolved environmental conflicts.

175. DOE's generalized representations concerning carbon reduction and potential renewable-or-nuclear power did not supply the missing site-specific basis for assessing location-dependent geotechnical work, site characterization, infrastructure planning, or power planning. Nor did DOE explain why those authorized activities would present no unique or unknown risks or unresolved resource conflicts at whichever site Phase 1 ultimately selected.

176. DOE's finding of no extraordinary circumstances was arbitrary, capricious, contrary to NEPA, and made without observance of required procedure. CX-033530 and the Phase 1 award should be declared unlawful, vacated, and remanded on that independent ground.

## COUNT III

### APA AND NEPA - IMPROPER SEGMENTATION AND FAILURE TO CONSIDER CONNECTED ACTIONS (5 U.S.C. §§ 702, 704, 706(2); 42 U.S.C. §§ 4332, 4336)

177. Plaintiffs incorporate the preceding allegations as though fully set forth herein.

178. DOE's issuance of CX-033530 and final authorization and funding of Phase 1 constitute final agency action. Under 10 C.F.R. § 1021.410(b)(3), DOE could apply a categorical exclusion only after determining that the proposal had not been segmented to avoid the appearance of significance and was not connected to an action with potentially significant effects.

179. Phase 1 and construction of the smelter were connected parts of one proposed action. The authorized site-selection, design, equipment, procurement, and infrastructure work existed to advance the construction project and had no substantial purpose or independent utility apart from that project.

180. DOE's own public descriptions confirm that connection. DOE described Phase 1 funding as "in support of [Century's] project to construct" the smelter and said Phase 1 would determine and announce the site and provide the documents necessary for project-level NEPA

review. Construction need not have been authorized in Phase 1 for the funded phase to be connected to the construction project it was designed to advance.

181. The two phases were not separate upstream or downstream projects outside DOE's authority. Cf. *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 186–91 (2025). They were successive, federally controlled components of a single smelter-development path, joined by DOE's cost share, award milestones, written-authorization condition, and retained go/no-go and later-funding authority.

182. By separating Phase 1 from the smelter it existed to develop, DOE evaluated only the least visibly consequential component while allowing federally funded work to select and deepen commitments to a particular project. DOE's finding of no improper segmentation or connected action failed to account for that functional and decisional interdependence.

183. .DOE therefore acted arbitrarily, capriciously, contrary to NEPA, and without observance of required procedure. CX-033530 and the Phase 1 award should be declared unlawful, vacated, and remanded because DOE improperly segmented one connected federal action.

## COUNT IV

### APA AND NEPA – PREMATURE COMMITMENT OF RESOURCES AND PREJUDICE TO REASONABLE ALTERNATIVES (5 U.S.C. §§ 702, 704, 706(2); 42 U.S.C. §§ 4332, 4336)

184. Plaintiffs incorporate the preceding allegations as though fully set forth herein.

185. DOE's issuance of CX-033530 and final authorization and funding of Phase 1 constitute final agency action. Under the regulations governing that decision, DOE could not authorize activities during the NEPA process that would limit the choice of reasonable alternatives. See 40 C.F.R. § 1506.1(a)–(b) (2024); 10 C.F.R. § 1021.410(b)(3) (2024).

186. CX-033530 contemplated possible long-lead deposits but did not identify limits on their amount, refundability, transferability, or approval criteria. DOE likewise did not explain whether any deposit it might approve, together with site-specific design, equipment specifications, vendor identification, procurement planning, and infrastructure planning, could be reversed, transferred, or abandoned without materially narrowing reasonable alternatives concerning location, scale, technology, power supply, mitigation, timing, and no action.

187. DOE's cost share, phased milestones, written-authorization condition, and retained go/no-go authority gave it control over the federally supported activities and required a reasoned determination that those activities would not prejudice the later review. The relevant question is the effect of the authorized activities on alternatives, not DOE's subjective motive or the applicant's willingness to proceed at its own risk.

188. This count does not allege that every expenditure on design or information gathering triggers NEPA review of construction. It challenges DOE's decision to place site selection, front-end engineering, equipment sizing, vendor identification, procurement and infrastructure planning, geotechnical work, site surveys, and possible long-lead deposits into a federally funded phase of a single smelter-development path before the promised site-specific review.

189. The claim is not that design expenditures alone physically injure Plaintiffs. It is that DOE completed a categorical-exclusion and funding decision that authorized selection and development of the project configuration without analyzing whether site-specific engineering, infrastructure, procurement, and long-lead steps would make alternatives materially more costly or impracticable. This distinguishes a challenge to merely tentative design from one to DOE's completed decision permitting defined project-committing work to proceed with federal support.

190. DOE's finding that Phase 1 would not prejudice later alternatives lacked a reasoned explanation addressing the implementation-oriented activities and possible commitments it authorized. CX-033530 and the Phase 1 award should be declared unlawful, vacated, and remanded insofar as they authorized or funded activities that materially narrowed reasonable alternatives before the required environmental review.

**COUNT V**

**APA AND NEPA – UNLAWFUL APPROVAL AND FEDERAL SUPPORT OF THE FIXED-SITE INOLA PROJECT WITHOUT ADDITIONAL NEPA REVIEW (5 U.S.C. §§ 702, 704, 706(1)-(2); 42 U.S.C. §§ 4332, 4336)**

191. Plaintiffs incorporate the preceding allegations as though fully set forth herein.

192. CX-033530 expressly required additional DOE NEPA review and written authorization before a changed project location or activity could receive federal funding and required additional review and a go/no-go decision before federal funding for subsequent phases.

193. DOE publicly identified Inola as the project supported through Award No. DE-CD0000111. Based on the public records alleged above and facts within DOE's possession, Plaintiffs allege on information and belief that DOE consummated the Post-Inola Award Approval.

194. DOE continued administering the award, and Century disclosed its intent to use potential DOE funding for the Inola project. Plaintiffs further allege that DOE made support available for Inola-specific or later-stage work beyond the original site-undetermined Phase 1 study.

195. DOE's February 2026 statement that it awarded $500 million to advance construction, USAspending's report of a $500 million total obligation and post-Inola award revisions, DOE's public identification of Inola as the grant-supported project, and the recipient's SEC disclosures support Plaintiffs' inference that DOE approved or allowed continued federal

support for the Inola project. DOE has not publicly disclosed the payment ledger or the agency record showing whether and when it made a Phase 2 go/no-go decision, construction authorization, or written location-change approval.

196. Plaintiffs allege on information and belief that the nonpublic actions underlying those records completed DOE's site-selection or federal-support decisions and carried legal consequences, including authorizing continued performance, accepting an award condition or milestone, maintaining eligibility for federal funding, or advancing the recipient into a later budget period.

197. The Post-Inola Award Approval is a discrete agency decision identified by function: DOE's completed acceptance or authorization of Inola as the location for continued performance under Award No. DE-CD0000111 and any attendant decision maintaining or advancing federal eligibility for changed-site or later-stage work. The precise instrument—whether written Contracting Officer authorization, site-selection milestone acceptance, award modification, budget-period action, or an equivalent decision—is contained in DOE's nonpublic award record.

198. DOE approved or implemented support for the fixed Inola configuration without publishing environmental review of the actual site, identity and control of the venture, capacity, technology, infrastructure within DOE's responsibility, power requirements and generation mix, greenhouse-gas performance, air emissions, water demands, transportation, waste streams, and effects on the surrounding community.

199. The original project was represented as approximately 75-percent lower-carbon and capable of using 100-percent renewable or nuclear electricity. The Inola venture emerged from a conditional EGA-Oklahoma commercial arrangement, uses EGA technology, remains dependent

on a negotiated PSO power supply, and is majority owned and controlled by EGA. DOE has not publicly explained how the award's quantified carbon-intensity and renewable-electricity objectives apply to the actual Inola design and power arrangement.

200. Plaintiffs allege on information and belief that DOE approved or implemented federal support for the changed Inola venture without deciding whether the fixed site, controlling entity, larger capacity, EGA technology, unresolved power arrangement, and Inola-specific activities remained within the approved federal action; whether additional review and written authorization were required; and how the published award objectives apply to the project. DOE's public linkage of the award to Inola supports that inference but is not itself the final agency action challenged.

201. DOE therefore acted arbitrarily, capriciously, contrary to NEPA, and without observance of procedure required by law.

202. The Post-Inola Award Approval went beyond a preferred alternative or continuing negotiation. Plaintiffs allege on information and belief that DOE used its award authority to accept the Inola location or changed project, determine award eligibility, and allow performance to proceed before the additional review reserved in CX-033530. Plaintiffs do not rely on accumulated state, corporate, or political commitments as federal action; those commitments matter only to the extent DOE funded, authorized, accepted, or relied on them and because DOE had to consider whether its own action materially prejudiced reasonable alternatives.

203. In the alternative, if DOE contends that no Post-Inola Award Approval exists, Plaintiffs allege that DOE has nonetheless permitted federal support for changed-location, changed-activity, or later-phase work without first making the discrete threshold determination and written authorization required before such support. The withheld decision is bounded: whether

the changed project remains covered by the existing review or requires additional NEPA review before DOE may provide federal support beyond the original Phase 1 limits.

204. Section 706(1) permits relief only for discrete agency action legally required. See *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62–64 (2004). Plaintiffs do not ask the Court to prescribe an EA, an EIS, or any substantive outcome. They seek only the required threshold decision before DOE continues federal support beyond the reviewed Phase 1 scope and an order preventing DOE from treating a withheld determination as though it had been made.

205. The alternatives are pleaded under Rule 8(d)(2): if the Post-Inola Award Approval exists, it is reviewable under § 706(2); if it does not exist but DOE is providing federal support beyond the original Phase 1 limits, the antecedent threshold determination has been unlawfully withheld under § 706(1).

206. The Post-Inola Award Approval, if it exists and exceeded the lawful limits of Phase 1, should be declared unlawful, vacated, and remanded. In the alternative, if DOE has provided federal support beyond those limits without making the antecedent threshold determination, that omission should be declared unlawful and DOE should be compelled to make the discrete threshold determination before continuing such support, without prescribing the form or outcome of DOE's NEPA review.

## COUNT VI

### REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF (Fed. R. Civ. P. 65; 5 U.S.C. §§ 702, 705, 706)

207. Plaintiffs incorporate the preceding allegations as though fully set forth herein.

208. Plaintiffs seek preliminary and permanent injunctive relief as a remedy for the APA and NEPA violations alleged in Counts I through V. This request depends on Plaintiffs' success on one or more of those counts and does not assert an independent substantive cause of action.

209. A preliminary injunction is warranted when Plaintiffs establish a substantial likelihood of success on the merits, likely irreparable harm absent relief, that the threatened injury outweighs the harm from an injunction, and that the injunction is not adverse to the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Pryor v. School District No. 1*, 99 F.4th 1243, 1249–50 (10th Cir. 2024).

210. Plaintiffs are likely to succeed on the merits for the reasons alleged in Counts I through V, including DOE's reliance on a site-undetermined categorical exclusion for a federally funded phase that selected, designed, procured for, and planned infrastructure for the smelter; DOE's failure to account for extraordinary circumstances, connected actions, and prejudice to alternatives; and DOE's alleged approval or support of the materially changed Inola project without the additional review reserved in CX-033530.

211. Absent preliminary relief, Plaintiffs face likely and imminent irreparable injury as the project moves from engineering, permitting, procurement, and infrastructure planning toward clearing, grading, excavation, permanent utilities, roads, rail facilities, foundations, and delivery or installation of project-specific equipment. Those actions would alter the site, deepen the manufactured *fait accompli*, and impair Plaintiffs' procedural opportunity to obtain informed federal consideration before irreversible work and resulting effects on their property, water, roads, air, quiet, darkness, views, wildlife, agricultural uses, and surrounding area.

212. The balance of harms and public interest favor a narrowly tailored injunction preserving the status quo. The requested relief would allow DOE to conduct lawful NEPA review and permit nondestructive environmental investigation to continue while preventing federal support from contributing to irreversible work. Defendants have no cognizable interest in implementing unlawful agency action, and the public has a strong interest in informed decision-

making, lawful expenditure of federal funds, and environmental review before commitments foreclose reasonable alternatives.

213. If Plaintiffs prevail on one or more of Counts I through V and vacatur and remand alone would not prevent continued implementation of the unlawful action, a permanent injunction is warranted upon proof of irreparable injury, the inadequacy of legal remedies, a favorable balance of hardships, and consistency with the public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–58 (2010). Plaintiffs seek no damages, and money cannot restore the opportunity for environmental review before irreversible federal commitments and site-disturbing work.

214. Plaintiffs therefore request preliminary and permanent injunctions prohibiting DOE and its officers, employees, and agents from authorizing, obligating, disbursing, reimbursing, or approving federal funds for Phase 2 or later work, a changed project location or activity, or irreversible Inola work—including clearing, grading, excavation, foundations, permanent roads, rail, utilities, other infrastructure, and delivery or installation of project-specific long-lead equipment—unless and until DOE completes the environmental review required by NEPA, while allowing lawful NEPA review and nondestructive environmental investigation to proceed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare that CX-033530 and the final Phase 1 award are unlawful because DOE (i) applied categorical exclusions A9 and B3.1 to activities outside their lawful scope; (ii) failed to provide a reasoned basis for finding no extraordinary circumstances; (iii) improperly segmented Phase 1 from the connected smelter project; and (iv) authorized or funded materially project-committing activities that prejudiced reasonable alternatives before the required environmental review;

B. Vacate and remand the portions of CX-033530 and the Phase 1 award authorizing or funding materially project-committing activities beyond neutral nondestructive information gathering, including any such activities implemented at Inola;

C. Declare unlawful and vacate the Post-Inola Award Approval if it exists and exceeded the lawful limits of Phase 1, or, if DOE has provided federal support beyond those limits without making the antecedent threshold determination, declare that omission unlawful and compel DOE to make the discrete threshold determination before continuing such support, without prescribing the form or outcome of DOE's NEPA review;

D. Remand the challenged agency actions to DOE for reasoned consideration of the actual federal action and the actual Inola project, including whether the project retains the low-carbon attributes and power-source assumptions that defined DOE's original selection, under the law applicable to those actions;

E. Upon the showing required by Federal Rule of Civil Procedure 65 and the traditional equitable factors, preliminarily and permanently enjoin DOE and its officers, employees, and agents from authorizing, obligating, disbursing, reimbursing, or approving federal funds for Phase 2 or later work, a changed project location or activity, or irreversible Inola work—including clearing, grading, excavation, foundations, permanent roads, rail, utilities, or other infrastructure, and delivery or installation of project-specific long-lead equipment—unless and until DOE completes the environmental review required by NEPA, while allowing lawful NEPA review and nondestructive environmental investigation to proceed;

F. Award Plaintiffs their reasonable costs and, if eligible, attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

G. Grant such other and further relief as the Court deems just and proper.

**NO JURY DEMAND**

This action seeks judicial review of federal agency action and equitable relief. Plaintiffs do not demand a jury.

Respectfully submitted,

**BARROW & GRIMM, P.C.**

/s/ Donald A. Lepp
Donald A. Lepp, OBA No. 16260
Trevor R. Henson, OBA No. 30104
Maddie Brady, OBA No. 36941
110 West Seventh Street, Suite 90
Tulsa, Oklahoma 74119
Telephone: 918-584-1600
Fax: 918-585-2444
Email: lepp@barrowgrimm.com
thenson@barrowgrimm.com
mbrady@barrowgrimm.com
*Attorneys for Plaintiffs*